## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: ASBESTOS LITIGATION | ) |
| | ) |
| JOHN W. PRUITT, SR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )          Civil Action No. 18-1101-MN-SRF |
| | ) |
| AIR & LIQUID SYSTEMS | ) |
| CORPORATION, et al., | ) |
| | ) |
| Defendants. | ) |

## REPORT AND RECOMMENDATION

### I.  INTRODUCTION

Presently before the court in this asbestos-related personal injury action are four motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 filed by Amdura LLC ("Amdura"),[1] BorgWarner Morse TEC LLC ("BorgWarner"),[2] Gardner Denver, Inc. ("Gardner Denver"), and Warren Pumps LLC ("Warren Pumps").[3]  (D.I. 311; D.I. 315; D.I. 318; D.I. 326) As indicated in the chart *infra* and for the reasons that follow, the court recommends

---

[1] Amdura is the successor to American Hoist & Derrick Company ("AH&D").  (D.I. 313 at 2)

[2] BorgWarner is the successor-by-merger to Borg-Warner Corporation ("Borg-Warner Corp."). (D.I. 316 at 1)

[3] The briefing for the pending motions is as follows:  Amdura's opening brief (D.I. 313), and plaintiff's answering brief (D.I. 344), Amdura's reply brief (D.I. 373); BorgWarner's opening brief (D.I. 316), plaintiff's answering brief (D.I. 342), and BorgWarner's reply brief (D.I. 374); Gardner Denver's opening brief (D.I. 319), plaintiff's answering brief (D.I. 338), plaintiff's supplemental answering brief (D.I. 365), and Gardner Denver's reply brief (D.I. 376); Warren Pumps' opening brief (D.I. 329), plaintiff's answering brief (D.I. 336), plaintiff's supplemental answering brief (D.I. 369), and Warren Pumps' reply brief (D.I. 380).

GRANTING Amdura and BorgWarner's motions for summary judgment and DENYING Gardner Denver and Warren Pumps' motions for summary judgment.[4]

| Defendant | Motion for Summary Judgment |
|---|---|
| Amdura LLC | GRANT |
| BorgWarner Morse TEC LLC | GRANT |
| Gardner Denver Inc. | DENY |
| Warren Pumps LLC | DENY |

## II.  BACKGROUND

### a.  Procedural History

On July 26, 2018, plaintiff John W. Pruitt, Sr. ("Mr. Pruitt") originally filed this personal injury action against multiple defendants, asserting claims arising from Mr. Pruitt's alleged harmful exposure to asbestos.  (D.I. 1)  On August 9, 2018, Mr. Pruitt filed an amended complaint (the "First Amended Complaint").  (D.I. 50)  On January 31, 2020, Amdura, BorgWarner, Gardner Denver, and Warren Pumps filed motions for summary judgment, individually.  (D.I. 311; D.I. 315; D.I. 318; D.I. 326)

---

[4] On January 31, 2020, defendant Ingersoll-Rand Company ("Ingersoll Rand") filed a motion for summary judgment (D.I. 332).  The briefing for the pending motion is as follows: Ingersoll Rand's opening brief (D.I. 333), plaintiff's answering brief (D.I. 348), plaintiff's supplemental answering brief (D.I. 367), and Ingersoll Rand's reply brief (D.I. 381).  On July 1, 2020, after oral argument, Ingersoll Rand filed a notice of bankruptcy with the court (D.I. 395).  The notice indicates that Ingersoll Rand underwent a corporate restructuring resulting in a new entity, Aldrich Pump LLC ("Aldrich"), which now owns the former Ingersoll Rand's alleged asbestos-related liabilities at issue in this litigation.  (*Id.*)  In addition, the notice indicates that on June 18, 2020, Aldrich Pump filed a voluntary petition for relief under the bankruptcy code in the United States Bankruptcy Court for the Western District of North Carolina.  (*Id.*)  Therefore, the automatic stay, 11 U.S.C. § 362, prevents the court from making a recommendation for disposition of the motion.

### b. Facts

Mr. Pruitt alleges that he developed mesothelioma as a result of exposure to asbestos-containing materials during his service as a machinist mate in the United States Navy and as a parts purchaser at Schroer Implement Co. ("Schroer").  (D.I. 50 at ¶ 15; Ex. A)  Mr. Pruitt contends that he was injured due to exposure to asbestos-containing products that defendants manufactured, sold, distributed, licensed, or installed.  (D.I. 50 at ¶¶ 5–13, 19–22)  Accordingly, Mr. Pruitt asserts claims for strict liability, negligence, false representation, and punitive damages.  (D.I. 50)

Mr. Pruitt was deposed on August 20 and 21, 2018.  (D.I. 79; D.I. 85)  Edmond Dumas ("Mr. Dumas"), a shipfitter who served on the *USS Tolovana* with Mr. Pruitt from September 1960 to December 1963, was also deposed on February 12, 2019, as a fact and product identification witness.  (D.I. 313, Ex. D at 14:4–10, 26:19–24)

### i. Mr. Pruitt

Mr. Pruitt joined the United States Navy in 1958.  (D.I. 329, Ex. B at 12:4–9)  He was first stationed on the *USS Bayfield*, an attack transport.  (*Id.* at 12:21–13:1)  In 1959, Mr. Pruitt was stationed on the *USS Tolovana*, an oil tanker.  (*Id.* at 13:1–3, 13:15–21, 14:10–15)  He served as a machinist mate and worked on auxiliary equipment such as pumps, valves, winches, purifiers, and compressors.  (*Id.* at 16:14–17:19)

Mr. Pruitt stated that he used machinery to ensure pumps were pumping to capacity.  (D.I. 313, Ex. B at 17:23–25)  He testified that he only worked on black oil pumps that pumped fuel oil from the *USS Tolovana* to other ships and that these pumps were located underneath the engine room.  (D.I. 313, Ex. B at 18:4–7, 11–14; Ex. C at 27:24–28:5)  He estimated that the pumps were twenty-five or thirty years old.  (D.I. 313, Ex. C at 21:19–24)  In repairing pumps,

he worked with packing material and gasket material.  (D.I. 313, Ex. B at 20:14–23:13)  Mr. Pruitt removed old packing material with a hook, which produced dust.  (*Id.* at 20:14–25)  He would then measure, cut, and insert new packing material into the packing gland before tightening and sealing the pump.  (*Id.* at 19:22–20:2)  Mr. Pruitt testified that this process also produced dust.  (*Id.* at 21:16–19)  He replaced the packing in pumps approximately once per year.  (*Id.* at 19:13–16)  Mr. Pruitt also removed gasket material with a scraper, which produced dust.  (*Id.* at 22:11–18)  Mr. Pruitt testified that he worked on the maintenance of pumps a couple times per month.  (*Id.* at 24:22–25:8)  He recalled Ingersoll Rand as a manufacturer of pumps and, though he knew there were other manufacturers of pumps, he could not recall their names. (D.I. 313, Ex. B  at 25:9–20, 27:17–21)

Mr. Pruitt replaced brakes and brake lining on winches a couple times per year.  (D.I. 313, Ex. B at 37:23–38:12, 42:11–16)  Winches were located on deck and came in three sizes: (1) six feet tall and six feet wide, (2) two feet tall and two feet wide, and (3) six feet tall and one inch wide.  (D.I. 313, Ex. C at 51:11–52:25)  Mr. Pruitt stated that he did not perform any brake work on the largest winches.  (*Id.* at 54:13–16)  When asked to define a winch, Mr. Pruitt testified that "[a] winch is something that you use to help move everything around."  (D.I. 313, Ex. B at 37:2–4)  He could not recall the manufacturer or maintenance history of the winches he encountered.  (D.I. 313, Ex. C at 53:3–14, 87:1–17)  In replacing winch brakes, he would remove portions of the winch to allow access to the brake and then remove the brake.  (*Id.* at 59:25–60:20)  It would take thirty minutes to remove the brake itself, as he had to loosen levers and take bolts out of the winch.  (*Id.* at 60:21–61:4)  Mr. Pruitt would cut a new brake pad and then use a brake lining machine to put the lining on the brake shoe and grind the brake.  (D.I. 313, Ex. B at 38:13–39:13)  It took a few hours to attach the brake pads to the brake lining.  (*Id.* at 26:12–

17)  He would install the brake lining by hammering the rivets into the brake shoe.  (D.I. 313, Ex. C at 67:12–20, 68:68–17)  He could not recall the manufacturer of the brake lining.  (*Id.* at 70:8–17)  Mr. Pruitt remembers Bendix as a manufacturer of brake pads and brake shoes.  (D.I. 313, Ex. B at 41:14–19; Ex. C at 84:11–15)

Mr. Pruitt was honorably discharged in 1963.  (D.I. 313, Ex. B at 42:17–21)  He subsequently worked at Schroer, a John Deere farm equipment dealership in Valdosta, Georgia.  (*Id.* at 42:17–43:8)  He started his career at Schroer as a runner and was later promoted to a parts manager in 1966.  (D.I. 313, Ex. B at 43:11–13; Ex. C at 103:8–13)  As a runner, he delivered and picked up parts such as brakes, clutches, and paint decals.  (D.I. 313, Ex. C at 30:9–16, 103:22–104:2, 104:13–20)  After picking up these parts, he would deliver them to Schroer.  (*Id.* at 105:3–10)  Mr. Pruitt estimated that sixty percent of his time was spent delivering parts and forty percent was spent in Schroer's warehouse.  (*Id.* at 106:18–107:7)  He did not recall the manufacturer of the brakes he delivered as a runner.  (*Id.* at 196:13–15)

In 1966, he started working as a parts manager and was tasked with finding and ordering parts, such as brakes and clutches, that were installed at Schroer.  (D.I. 313, Ex. B at 46:11–14; Ex. C at 30:2–31:2, 102:18–22, 103:14–21)  Approximately fifteen percent of the John Deere tractors were under warranty and, for these trucks, the mechanics at Schroer used Bendix brakes and clutches obtained from a John Deere dealer.  (D.I. 313, Ex. B at 49:1–19)  Each Bendix brake came in a box labeled with a part number but did not contain a warning that it came from a John Deere dealership.  (D.I. 313, Ex. C at 123:4–14)  Mr. Pruitt did not recall seeing any parts that were labelled "John Deere" and sometimes received brakes without an indication as to their manufacturer.  (*Id.* at 144:23–145:15, 135:22–136:6)  He stated that he handled bare parts if they were delivered without packaging.  (*Id.* at 163:21–164:7)  For the eighty-five percent of John

Deere tractors that were not under warranty, the mechanics used "[a]ny brand [of brakes they] could get a hold of," typically "the cheapest [they] could find."  (D.I. 313, Ex. B at 50:6–13) John Deere was the most expensive brand of equipment.  (D.I. 313, Ex. C at 157:14–25)  He only ordered John Deere supplied clutches for the John Deere brakes but could not recall who manufactured these clutches.  (D.I. 313, Ex. B at 50:21–51:2, 53:2–5)

Mr. Pruitt testified that, during his career at Schroer, he did not perform any work on farm equipment.  (D.I. 313, Ex. C at 32:10–21)  As the parts manager, he spent approximately eighty percent of his time waiting on customers and mechanics at the parts counter, which was twenty to thirty feet away from the mechanics performing work on the tractors.  (D.I. 313, Ex. B at 48:15–17; Ex. C at 32:22–33:1)  He would only see mechanics perform work if he took a part into the mechanic area or if he walked through the shop.  (D.I. 313, Ex. C at 131:22–132:3; 133:5–21)  Mr. Pruitt could not estimate how often he took parts into the mechanic area, but noted that he did not normally do so, as mechanics ordinarily came to the parts counter to retrieve parts.  (*Id.* at 132:4–133:4)

Mr. Pruitt testified that he observed others perform brake work two or three times per week on both diesel and gas John Deere tractors.  (D.I. 313, Ex. B at 45:14–16; Ex. C at 107:12–108:1)  Mr. Pruitt testified that he also observed others perform approximately two or three clutch jobs per week and suggested that the frequency of these clutch jobs increased in the springtime.  (D.I. 313, Ex. B at 45:17–22)  He testified that when mechanics performed brake jobs or clutch jobs, dust was produced.  (*Id.* at 47:16–48:14)

He left Schroer in 1977.[5]  (*Id.* at 53:15–17)  He worked as a paramedic until March of 2017.  (*Id.* at 53:18–25)  Mr. Pruitt was diagnosed with mesothelioma in May of 2018.  (*Id.* at 54:20–22, 55:14–16)

### ii.  Mr. Dumas

Mr. Dumas served as a shipfitter third class on the *USS Tolovana* from September 1960 through December 1963.  (D.I. 313, Ex. D at 13:12–16, 13:24–14:10)  As a shipfitter, Mr. Dumas performed valve repairs by replacing gaskets and packing.  (*Id.* at 15:4–9, 21:16–18)  He and Mr. Pruitt were assigned to work together, which they did approximately thirty percent of the time.  (D.I. 313, Ex. D at 30:8–19, 31:20–23, 100:20–25; Ex. E at 18:23–19:7)

Mr. Dumas testified that there were three different types of fuel on the *USS Tolovana*: crude oil, JP-5,[6] and avgas.  (D.I. 313, Ex. D at 19:16–21)  Crude oil was used for the majority of ships, JP-5 was used for fighter jets, and avgas was used for aircraft carriers.  (D.I. 313, Ex. D at 19:22–20:3; Ex. E at 39:11–14)  There were different types of pumps for each of these fuel types.  (D.I. 313, Ex. D at 20:9–16)  Mr. Dumas observed Mr. Pruitt performing work and maintenance on cargo pumps, JP-5 pumps, and avgas pumps.  (D.I. 313, Ex. E at 67:17–23)  Cargo pumps pumped crude oil and were found in the aft pump room.  (*Id.* at 42:2–43:17, 43:24–44:1)  Mr. Dumas could not recall the pressure, serial number, or maintenance history of any particular pump.  (D.I. 313, Ex. D at 111:13–20, 112:5–16)  Mr. Dumas testified that most of the pumps were mounted vertically but could not recall how all of the pumps were mounted.  (*Id.* at 111:21–112:4)

---

[5] The First Amended Complaint notes that Mr. Pruitt left Schroer around 1963 or 1964, but Mr. Pruitt testified that he left Schroer in 1976 or 1977 in his deposition.  (D.I. 50, Ex. A; D.I. 313, Ex. B at 53:15–17)

[6] Mr. Dumas testified that JP-5 was similar to kerosene.  (D.I. 313, Ex. E at 39:7–10)

Mr. Dumas recalled that, before Mr. Pruitt performed maintenance on a pump, Mr. Pruitt would tag a pump to inform others on the ship that the pump was offline and that he was performing maintenance.  (*Id.* at 32:4–15, 40:6–20)  Mr. Dumas testified that Mr. Pruitt inspected pumps, replaced valves, and replaced gaskets.  (*Id.* at 33:8–13)  He observed Mr. Pruitt working in the mid ship pump room, which housed the JP-5 pumps, and the aft pump room, which housed the four major cargo pumps.  (*Id.* at 36:9–37:16)  Mr. Dumas stated that he was unsure what specific maintenance work Mr. Pruitt performed on pumps.  (D.I. 313, Ex. E at 68:20–69:18)

Mr. Dumas observed Mr. Pruitt replace gaskets and packing on cargo pumps and testified that this maintenance produced dust.  (D.I. 313, Ex. D at 43:5–19, 44:2–8, 46:3–15, 47:24–48:11)  Mr. Dumas estimated that Mr. Pruitt had to perform maintenance on cargo pumps once every one or two months, and may have had to maintain cargo pumps with greater frequency when the *USS Tolovana* was refueling many other ships.  (*Id.* at 49:10–50:13) Mr. Dumas testified that Mr. Pruitt also worked on fire bilge, ballast, fire general service, fuel transfer, diesel emergency fire, and auxiliary pumps.  (*Id.* at 58:18–24, 60:2–11, 64:12–25, 67:25–68:12, 70:20–71:15)

Mr. Dumas observed Mr. Pruitt perform general maintenance on a fire general service pump and a fuel transfer pump every one to two months, which required removing and replacing gasket and packing material.  (*Id.* at 61:4–67:23)  Mr. Dumas further testified that Mr. Pruitt's maintenance work took two to three hours and created visible dust, which Mr. Dumas observed Mr. Pruitt breathe.  (*Id.*)  Mr. Dumas also stated that he saw Mr. Pruitt replacing gaskets and packing material for a diesel emergency fire pump in the aft section of the ship, which caused Mr. Pruitt to breathe in "dust and particles" in a process that took one to two hours.  (*Id.* at

67:24– 70:19) He observed Mr. Pruitt inspecting the diesel emergency fire pump every one to two months in a process that involved gaskets and packing material.  (*Id.*)

## III.    LEGAL STANDARD

### a.  Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those that could affect the outcome of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party."  *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

The moving party bears the initial burden of proving the absence of a genuinely disputed material fact.  *See Celotex*, 477 U.S. at 322.  The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial, and the court must view the evidence in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-61 (3d Cir. 1989); *Scott v. Harris*, 550 U.S. 372, 380 (2007).  An assertion of whether or not a fact is genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A) & (B).  To defeat a motion

for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" rather, there must be enough evidence to enable a jury to reasonably find for the non-moving party on the issue. *See Anderson*, 477 U.S. at 247-49 (emphasis in original). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex*, 477 U.S. at 322. If the non-movant fails to make a sufficient showing on an essential element of its case on which it bears the burden of proof, then the movant is entitled to judgment as a matter of law. *See Celotex*, 477 U.S. at 322-23.

If a party fails to address another party's assertion of fact, the court may consider the fact undisputed, or grant summary judgment if the facts show that the movant is entitled to it. Fed. R. Civ. P. 56(e)(2)–(3).

### b. Maritime Law:  Substantial Factor Causation

The parties do not dispute that maritime law applies to all Naval and sea-based claims. (D.I. 274) In order to establish causation in an asbestos claim under maritime law, a plaintiff must show, for each defendant, "that (1) he was exposed to the defendant's product, and (2) the product was a substantial factor[7] in causing the injury he suffered." *Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488, 492 (6th Cir. 2005) (citing *Stark v. Armstrong World Indus., Inc.*, 21

---

[5] "Maritime law incorporates traditional 'substantial factor' causation principles, and courts often look to the Restatement of Torts (2nd) for a more helpful definition." *Delatte v. A.W. Chesterton Co.*, 2011 WL 11439126, at *1 n.1 (E.D. Pa. Feb. 28, 2011). The comments to the Restatement indicate that the word "substantial," in this context, "denote[s] the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility." Restatement (Second) of Torts § 431 cmt. a (1965).

F. App'x 371, 375 (6th Cir. 2001)); *Dumas v. ABB Grp., Inc.*, 2015 WL 5766460, at \*8 (D. Del.

Sept. 30, 2015), *report and recommendation adopted*, 2016 WL 310724 (D. Del. Jan. 26, 2016);

*Mitchell v. Atwood & Morrill Co.*, 2016 WL 4522172, at \*3 (D. Del. Aug. 29, 2016), *report and*

*recommendation adopted*, 2016 WL 5122668 (D. Del. Sept. 19, 2016); *Denbow v. Air & Liquid*

*Sys. Corp.*, 2017 WL 1199732, at \*4 (D. Del. Mar. 30, 2017), *report and recommendation*

*adopted*, 2017 WL 1427247 (D. Del. Apr. 19, 2017).

"In establishing causation, a plaintiff may rely upon direct evidence (such as testimony of

the plaintiff or Decedent who experienced the exposure, co-worker testimony, or eye-witness

testimony) or circumstantial evidence that will support an inference that there was exposure to

the defendant's product for some length of time."[8] *Abbay v. Armstrong Int'l, Inc.*, 2012 WL

975837, at \*1 n.1 (E.D. Pa. Feb. 29, 2012) (citing *Stark*, 21 F. App'x at 376).  On the other hand,

"'[m]inimal exposure' to a defendant's product is insufficient [to establish causation].  Likewise,

a mere showing that defendant's product was present somewhere at plaintiff's place of work is

insufficient." *Lindstrom*, 424 F.3d at 492 (quoting *Stark*, 21 F. App'x at 376) (internal citation

omitted).  "Rather, the plaintiff must show 'a high enough level of exposure that an inference

that the asbestos was a substantial factor in the injury is more than conjectural.'" *Abbay*, 2012

WL 975837, at \*1 n.1 (quoting *Lindstrom*, 424 F.3d at 492).  "Total failure to show that the

defect caused or contributed to the accident will foreclose as a matter of law a finding of strict

product[] liability." *Stark*, 21 F. App'x at 376 (citations omitted).

In *Devries*, the Supreme Court rejected "the more defendant-friendly bare-metal

defense," which provided that "[i]f a manufacturer did not itself make, sell, or distribute the part

---

[8] However, "substantial exposure is necessary to draw an inference from circumstantial evidence
that the exposure was a *substantial* factor in causing the injury."  *Stark*, 21 F. App'x at 376
(emphasis in original) (quoting *Harbour v. Armstrong World Indus., Inc.*, 1991 WL 65201, at \*4
(6th Cir. Apr. 25, 1991)).

or incorporate the part into the product, the manufacturer is not liable for harm caused by the integrated product . . . ." *Air & Liquid Systems Corp. v. Devries*, 139 S. Ct. 986, 993 (2019). The Supreme Court held that a product manufacturer has a duty to warn in the context of maritime tort law "when (i) its product requires incorporation of a part, (ii) the manufacturer knows or has reason to know that the integrated product is likely to be dangerous for its intended uses, and (iii) the manufacturer has no reason to believe that the product's users will realize that danger." *Id.* at 987, 995-96.

  **c.  Georgia Law**

  The parties do not dispute that Georgia law applies to all land-based claims.  (D.I. 274) Under Georgia law, the plaintiff in an asbestos-exposure action must show that a particular defendant's product was a "contributing factor in bringing about the plaintiff's damages," which requires the plaintiff to establish that he was in proximity to the use of defendant's asbestos-containing product.  *John Crane, Inc. v. Jones*, 604 S.E.2d 822, 824 (Ga. 2004).  It is not necessary for plaintiff to demonstrate that defendant's contribution to his resulting injury was "substantial."  *Id.*  Furthermore, "Georgia's causation standard does not require the plaintiff to recall a specific time, job, or incident during which he used the defendant's product."  *In re Asbestos Litig.*, 2011 WL 1123053, at *1 (Del. Super. Ct. Mar. 15, 2011) (analyzing motion for summary judgment in asbestos-related personal injury action governed by Georgia law).  Rather, a plaintiff "must present evidence 'that a particular defendant's asbestos-containing product was used at the job site and that the plaintiff was in proximity to that product at the time it was being used.'"  *Hoffman v. AC&S, Inc.*, 548 S.E.2d 379, 382 (Ga. Ct. App. 2001) (quoting *Odum v. Celotex Corp.*, 764 F.2d 1486, 1488 (11th Cir. 1985)).

IV.    **DISCUSSION**

a.  **Applicable Law**

As a preliminary matter Mr. Pruitt asserts that the standard articulated by the Supreme

Court in *Devries* applies to defendants' motions for summary judgment and, under this standard,

the motions for summary judgment should be denied.  (D.I. 340 at 14–15)  However, the bare-

metal defense is not in issue here because defendants argue the lack of substantial factor

causation under *Lindstrom*, i.e., the lack of sufficient product exposure and no nexus to causation

of the alleged injuries.  (D.I. 313 at 10–15; D.I. 316 at 5–6; D.I. 314 at 7–10)

b.  **Amdura**

Amdura argues Mr. Pruitt cannot show that Amdura's products were a substantial factor

in causing Mr. Pruitt's injury as required under maritime law because plaintiffs have not

identified instances of exposure to an AH&D winch.  (D.I. 313 at 5; D.I. 373 1–5)  In response,

Mr. Pruitt argues ship documents and his testimony provide circumstantial evidence that he

worked on cargo winches manufactured by AH&D.  (D.I. 344 at 2; Ex. E; Ex. F)  The court

recommends granting Amdura's motion for summary judgment because Mr. Pruitt provides

insufficient evidence of product identification.  *See MacQueen v. Union Carbide Corp.*, C.A. No.

13-831-SLR, 246 F. Supp. 3d 1004, 1010 (D. Del. 2017) ("The threshold question that the Court

must answer in the causation inquiry is whether Plaintiff has raised a genuine issue of material

fact as to whether [the plaintiff] was exposed to any of the Defendants' products.").

Mr. Pruitt's circumstantial evidence requires too many inferences, unsupported by

evidence in the record, to survive summary judgment.  Mr. Pruitt testified about his work on

winches generally but could not recall the manufacturer of the winches he maintained.  (D.I. 313,

Ex. B at 38:13–39:13, 59:25–61:4; Ex. C at 53:3–14, 87:1–17)  Mr. Pruitt's inability to name the

manufacturer of a specific winch is not dispositive because he may establish causation under maritime law through direct or circumstantial evidence.  *See Walker v. Blackmer Pump Co.*, 367 F. Supp. 3d 360, 377 (E.D. Pa. 2019) (quoting *Abbay v. Armstrong, Int'l, Inc.*, 2012 WL 975837, at *1 n.1 (E.D. Pa. Feb. 29, 2012)).  However, the circumstantial evidence offered in this case does not "support an inference that there was exposure to [Amdura's] product."  *Id.*  For example, the ship records Mr. Pruitt relies on predate Mr. Pruitt's service.  (D.I. 313, Ex. G at 46; D.I. 344, Ex. E, Ex. F)  Therefore, Mr. Pruitt necessarily relies on an otherwise unsupported inference that the AH&D winches referenced in records from 1943 and 1952 remained on board the *USS Tolovana* until 1959, Mr. Pruitt's first year of service on the *USS Tolovana*.  (D.I. 313, Ex. B at 42:17–21)  Further, when asked to define a winch, Mr. Pruitt testified that "[a] winch is something that you use to help move everything around."  (*Id.* at 37:2–4)  Without citation to the record or outside sources for support, Mr. Pruitt argues his reference to moving things around implicates cargo winches and, therefore, he necessarily worked on AH&D cargo winches.  (D.I. 344 at 2–3; D.I. 394 at 21:15–17)  Mr. Pruitt offers no explanation for the contention that Mr. Pruitt's definition of a winch necessarily means that he worked on cargo winches.  (D.I. 344 at 3)  In addition, ship records show that the universe of winches on board the *USS Tolovana* was not limited to AH&D winches.  (D.I. 313, Ex. G at 46; D.I. 344, Ex. F)  Mr. Pruitt also testified to having worked on three sizes of winches during his service on board the *USS Tolovana*, none of which match the sizes of the AH&D winches listed in the proffered ship records.  (D.I. 313, Ex. C at 52:13–25, 75:8–13, Ex. G at 46; D.I. 344, Ex. F)  The chain of inferences required to conclude that Mr. Pruitt worked on AH&D winches is too attenuated to establish the threshold exposure element of causation. *See MacQueen*, 246 F. Supp. 3d at 1010.

Mr. Pruitt cites *Walker v. Blackmer Pump Company*, 367 F. Supp. 3d 360 (E.D. Pa. 2019) to support his argument that his failure to offer direct product identification testimony is not dispositive of whether his exposure to an AD&H product was a substantial factor in causing his mesothelioma.  (D.I. 344 at 9, 11)  Mr. Pruitt accurately states the law; however, *Walker* is distinguishable.  In *Walker*, the plaintiff presented circumstantial evidence showing that the defendants' products were in the *USS Plymouth Rock*'s engine room, where the plaintiff spent fifty percent of his two years of service.  *Walker*, 367 F. Supp. 3d at 375–77.  Evidence also showed that machinists often removed asbestos-containing substances from the defendants' products while the plaintiff stood in the engine room.  *Id.*  Unlike *Walker*, Mr. Pruitt does not present sufficient evidence about the locations of AH&D winches to draw the conclusion that Mr. Pruitt worked on those winches without speculation.  Mr. Pruitt testified that he worked on winches a couple times per year, without regard to the location of such work or the type of winch.  (D.I. 313, Ex. B at 42:11–16, Ex. C at 25:13–17)

Further, in *Walkup v. Air & Liquid Systems Corporation*, C.A. No. 12-1635-SLR-SRF, 2014 WL 2514353, at *6–7 (D. Del. June 4, 2014), the plaintiff presented evidence showing that the defendant's products were on board the plaintiff's ship in the control room and in engine room number four.  *Id.* at *7.  However, the court granted summary judgment in favor of the defendant because the plaintiff failed to proffer any evidence that he had done any work in the control room or engine room number four.  *Id.*  Like *Walkup*, the record before the court lacks evidence connecting Mr. Pruitt's work on board the *USS Tolovana* to an AH&D product beyond conjecture and speculation.  *See id.*; *Lindstrom*, 424 F.3d at 492.  The mere presence of AH&D winches on board the *USS Tolovana* is insufficient to establish causation.  *See Lindstrom*, 424 F.3d at 492 ("[A] mere showing that defendant's product was present somewhere at plaintiff's

place of work is insufficient."). Mr. Pruitt's circumstantial evidence amounts to an impermissible chain of inferences that fails to create a genuine issue of material fact as to whether Amdura's products were a substantial factor in causing Mr. Pruitt's injuries. *See id.* Therefore, the court recommends granting Amdura's motion for summary judgment.

### c. **BorgWarner**

BorgWarner argues that Mr. Pruitt cannot show that BorgWarner's products were a substantial factor in causing Mr. Pruitt's injury as required under maritime law or a contributing factor in causing Mr. Pruitt's injury as required under Georgia law because Mr. Pruitt has not identified instances of exposure to a BorgWarner product equipped with asbestos-containing components. (D.I. 316 at 5–6)

Mr. Pruitt counters that his work area was twenty to thirty feet from the area where mechanics worked on equipment. (D.I. 342 at 2, 7) Mr. Pruitt recalled approximately three clutch jobs being performed each week and that this work produced dust. (*Id.*) Mr. Pruitt noted that he did not perform any work on brakes or clutches at Schroer; he ordered parts that the mechanics handled. (D.I. 313, Ex. B at 46:11–14; Ex. C at 30:25–31:2, 32:10–21, 102:18–22, 103:14–21)

Mr. Pruitt's alleged exposure to BorgWarner products is limited to land-based exposure and, therefore, Georgia law applies. (D.I. 274) Mr. Pruitt is the only product identification witness as to his alleged exposures during his career at Schroer. Mr. Pruitt's testimony fails to establish that an asbestos-containing BorgWarner product was used at his job site and that he was in proximity to that product at the time it was being used to create a genuine issue of material fact regarding contributing factor causation under Georgia law. *See Hoffman*, 548 S.E.2d at 382.

Mr. Pruitt did not work hands on with any BorgWarner products but was stationed twenty to thirty feet from mechanics working on equipment at Schroer.  (D.I. 342, Ex. B at 45:4–6; D.I. 313, Ex. C at 32:10–14)  Although BorgWarner was one of fourteen or fifteen friction suppliers for John Deere, Mr. Pruitt did not observe any mechanics in his vicinity working with BorgWarner clutches.  (D.I. 394 at 95:18–21; D.I. 342, Ex. H at 5)  Mr. Pruitt alleges that because there were only five asbestos-containing friction suppliers,[9] twenty percent of the estimated two-thousand clutch jobs Mr. Pruitt was exposed to over fifteen years involved BorgWarner products.  (D.I. 394 at 99:1–8, 100:2–9; D.I. 342, Ex. G at 26:4–25, 27:1–6)  Even if BorgWarner was one of five asbestos-containing friction suppliers, the court cannot conclude that Mr. Pruitt was more likely than not exposed to these products without speculation.  *See Hoffman*, 548 S.E.2d at 382.  The evidence does not establish that an asbestos-containing BorgWarner product was used at Mr. Pruitt's job site, nor does it show that he was in proximity to that product at the time it was being used.  *See id.*

 Pruitt's evidence fails to create a genuine issue of material fact as to whether BorgWarner's products were a contributing factor in causing his injuries.  *See John Crane, Inc.*, 604 S.E.2d at 824.  Therefore, the court recommends granting BorgWarner's motion for summary judgment.

### d.  Gardner Denver

Gardner Denver argues that Mr. Pruitt cannot show that Gardner Denver's products were a substantial factor in causing Mr. Pruitt's injury as maritime law requires because Mr. Pruitt has not identified any instance of his exposure to a Gardner Denver product equipped with asbestos-

---

[9] In a deposition, John Deere's corporate representative Ronald Braft listed five asbestos-containing friction material manufacturers: Raybestos Manhattan, Raymark, Bendix, BorgWarner and Dana Industries.  (D.I. 342, Ex. G at 26:4–25, 27:1–63)

containing components.[10]  (D.I. 314 at 2, 7–10)  Mr. Pruitt argues that the record contains

evidence demonstrating that Mr. Pruitt worked on a Gardner Denver diesel emergency fire pump

and was exposed to asbestos.  (D.I. 338 at 2, 11)

Mr. Pruitt testified as to his work on pumps generally.  (D.I. 313, Ex. B at 20:14–23:13)

Mr. Dumas testified that the *USS Tolovana* had a diesel emergency fire pump on which he

observed Mr. Pruitt perform work.  (D.I. 338, Ex. E at 67:24–70:19)  The record contains a

general information book dated July 1972 for the *USS Tolovana*, which lists Gardner Denver as

the manufacturer of the diesel emergency fire pump on board.  (D.I. 338, Ex. G at 40)  Mr.

Pruitt's service record shows that he was the "P.O. in charge of the mid ship and aft[] pump

rooms."  (D.I. 338, Ex. E at Ex. 6)  Mr. Pruitt argues that his own testimony and service record,

Mr. Dumas' testimony, and the 1972 *USS Tolovana* information book show that Mr. Pruitt

worked on a Gardner Denver diesel emergency fire pump.  (D.I. 338 at 2, 10–11)  Mr. Pruitt

argues that the court should "cross-reference [Mr. Dumas'] testimony with documents

identifying these pumps" to conclude that Mr. Pruitt has put forth evidence suggesting that

Gardner Denver manufactured a pump on which Mr. Pruitt worked.  (D.I. 338 at 11)

Mr. Pruitt's product identification evidence reveals that he was exposed to an asbestos-

containing Gardner Denver diesel emergency fire pump while on board the *USS Tolovana*.  Mr.

Pruitt testified as to his work on various pumps throughout his service.  (D.I. 313, Ex. B at

20:14–23:13)  Ship records from July of 1972 indicate that a Gardner Denver pump was located

---

[10] Gardner Denver argues that the affidavit of Timothy Bumgarner ("Mr. Bumgarner") should
not be considered, as it is inadmissible hearsay.  (D.I. 319 at 7–10)  In opposing Gardner
Denver's motion, Mr. Pruitt does not rely on Mr. Bumgarner's affidavit and acknowledges the
mootness of the admissibility issue.  (D.I. 365 at 21)  Therefore, the court does not address
whether the affidavit is admissible and does not consider it in deciding the motions pending
before the court.

on board.[11]  (D.I. 338, Ex. G at 40)  Records also indicate that there was only one diesel

emergency fire pump on board.  (*Id.* at 37)  Gardner Denver does not dispute that they

manufactured the single diesel emergency fire pump located on the *USS Tolovana* during Mr.

Pruitt's service.  (D.I. 394 at 75:14–18)  In his affidavit, Captain William A. Lowell, an expert in

Naval equipment, stated that the diesel emergency fire pump on board the *USS Tolovana*

required the use of asbestos-containing packing and gaskets.  (D.I. 338, Ex. H at 7)  Although

neither Mr. Pruitt nor Mr. Dumas identified Gardner Denver by name, Mr. Dumas testified that

he saw Mr. Pruitt replacing the diesel emergency fire pump's gaskets and packing material in the

aft section of the ship.  (D.I. 338, Ex. E at 68:23–25; D.I. 394 at 76:5–9)  The Gardner Denver

pump, however, was located in the forward pump room.  (D.I. 338, Ex. G at 40; D.I. 394 at

76:13–19)  This discrepancy is not fatal at this stage but poses a question of fact for the jury to

consider.  *See Walker*, 367 F. Supp. 3d at 377.

Mr. Pruitt's evidence establishes the "frequency, regularity, or proximity" of his work on

the Gardner Denver pump to create a genuine issue of material fact regarding substantial factor

causation.  *See Thomasson v. Air & Liquid Sys. Corp.*, 2015 WL 1639730, at *4 (D.N.J. Apr. 9,

2015).  In his testimony, Mr. Pruitt described performing maintenance on pumps "about once a

year" unless repairs were needed.  (D.I. 376, Ex. A at 22:15–23:1)  In addition to Mr. Pruitt's

annual work on the pump, Mr. Dumas stated that Mr. Pruitt inspected pumps, specifically

mentioning the diesel emergency fire pump, every one to two months in a process that involved

---

[11] These ship records postdate Mr. Pruitt's service, however; unlike the evidence presented
related to Amdura discussed in section IV.b, *supra*, Mr. Pruitt presented eyewitness testimony
regarding his work on the diesel emergency fire pump.  (D.I. 394 at 76:5–9; D.I. 338, Ex. E at
68:23–25)  Additionally, the universe of  diesel emergency fire pumps on board the *USS
Tolovana* was limited to one pump, and Gardner Denver does not dispute that they manufactured
this pump.  (D.I. 338, Ex. G at 37; D.I. 394 at 75:14–18)  Therefore, the inference that Mr. Pruitt
worked on a Gardner Denver pump does not require impermissible conjecture.

working on packing material and gaskets.  (D.I. 313, Ex D at 67:24– 70:19; D.I. 365)  In his testimony regarding Mr. Pruitt's work on the diesel emergency fire pump, Mr. Dumas stated that he observed Mr. Pruitt replacing gaskets and packing material, which caused Mr. Pruitt to breathe in "dust and particles" in a process that took one to two hours.  (*Id.*)  Based on the presence of the Gardner Denver diesel emergency fire pump and testimony regarding Mr. Pruitt's work on the pump, a reasonable jury could conclude that Mr. Pruitt worked on the Gardner Denver pump with the requisite frequency and proximity.  *See Thomasson* 2015 WL 1639730, at *4; *Abbay*, 2012 WL 975837, at *1 n.1 (finding that a plaintiff may rely upon co-worker or eye-witness testimony to support an inference that there was exposure to a defendant's product).

There remains a genuine issue of material fact as to whether Mr. Pruitt worked on the Gardner Denver emergency diesel fire pump to such an extent that it was a substantial factor in causing his subsequent injuries.  *See Lindstrom*, 424 F.3d at 492; *Walker*, 367 F. Supp. 3d at 376; *Abbay*, 2012 WL 975837, at *1 n.1 (citing *Redland Soccer Club, Inc. v. Dep't of Army of U.S.*, 55 F.3d 827, 851 (3d Cir.1995)) ("[T]he question of 'substantiality' is one of degree normally best left to the fact-finder.").  Therefore, the court recommends denying Gardner Denver's motion for summary judgment.

### e.  Warren Pumps

Warren Pumps argues that Mr. Pruitt cannot show that Warren Pumps' products were a substantial factor in causing Mr. Pruitt's injury as required under maritime law because Mr. Pruitt has not identified instances of exposure to a Warren Pump equipped with asbestos-containing components.[12]  (D.I. 329 at 2, 8–12)  Mr. Pruitt argues that the circumstantial

---

[12] Warren Pumps also argues that the affidavit of Timothy Bumgarner ("Mr. Bumgarner") should not be considered because it is inadmissible hearsay.  (D.I. 329 at 2, 12–17)  In opposing Warren

evidence taken as a whole, specifically considering Mr. Dumas' testimony together with ship records, creates genuine issues of material fact related to product identification and substantial factor causation.  (D.I 336 at 12–13)

Mr. Pruitt testified about his work on pumps generally, but he never testified to having worked on a Warren Pump.  (D.I. 329, Ex. B at 17:6–18:24)  He identified only Ingersoll Rand as a manufacturer of pumps on board the *USS Tolovana*.  (D.I. 329, Ex. B at 23:17–25; Ex. C at 23:9–22)  Mr. Pruitt testified that he spent most of his time on board the *USS Tolovana* in the engine room and that he worked in the "aft pump room" and the "midship pump room."  (D.I. 336, Ex. B at 18:25–19:6; Ex. M)

Mr. Dumas testified that he observed Mr. Pruitt work on a fire general service pump and a fuel transfer pump.  (D.I. 369, Ex. E at 61:2–67:22)  Mr. Dumas did not identify any products made by Warren Pumps.  However, Mr. Dumas testified to having observed Mr. Pruitt perform general maintenance on these pumps every one to two months, which required removing and replacing gaskets and packing material.  (*Id.*)  Mr. Dumas further testified that Mr. Pruitt's maintenance work took two to three hours and created visible dust, which Mr. Dumas observed Mr. Pruitt breathe.  (*Id.*)

Mr. Pruitt relies on ship records from 1952 and 1972—predating and postdating Mr. Pruitt's service—for circumstantial evidence in order to create a factual issue about whether the fire general service pump and the fuel transfer pump that Mr. Dumas testified to having seen Mr. Pruitt work on were manufactured by Warren Pumps.  (D.I. 369 at 4–5)  Both sets of records create a genuine issue of fact for the jury to decide whether a fire general service pump and a

Pumps' motion, Mr. Pruitt does not rely on Mr. Bumgarner's affidavit and acknowledges the mootness of the admissibility issue.  (D.I. 369 at 2 n.6)  Therefore, the court does not address whether the affidavit is admissible and does not consider it in deciding the motions pending before the court.

fuel oil transfer pump by Warren Pumps were located in the *USS Tolovana's* engine room, where Mr. Pruitt spent the "vast majority" of his time.  (D.I. 369, Ex. F; Ex. G; Ex. M)

Mr. Pruitt relies on discovery provided by Warren Pumps in other cases along with an instruction manual for Warren Pumps' fire pump from 1961 to create a factual issue about whether Warren Pumps products on board the *USS Tolovana* were provided to the United States Navy with asbestos-containing gaskets and packing material.  (D.I. 369, Ex. H, Ex. I, Ex. J, Ex. K, Ex. L, Ex. S, Ex. N, Ex. O at 7–8 )  A reasonable jury could find that those same records establish that replacement parts for the relevant pumps that Warren Pumps provided to the Navy during the relevant time contained asbestos.  (*Id.*)  In an affidavit, Captain Arnold Moore, Mr. Pruitt's naval equipment expert, asserted that the fuel oil transfer pump and the fire pump mentioned were manufactured by Warren Pumps and remained on board the *USS Tolovana* throughout Mr. Pruitt's service.  (D.I. 369, Ex. T at 7–9)  Captain Moore's affidavit also states that the relevant pumps would have been insulated with "85% magnesia," an insulating material containing 15% asbestos fiber.  (*Id.*)

Mr. Pruitt's testimony, Mr. Dumas' testimony, and Captain Moore's affidavit viewed in the light most favorable to Mr. Pruitt, provide circumstantial evidence upon which a reasonable jury could conclude that Mr. Pruitt was exposed to an asbestos-containing Warren Pumps product.  Unlike the evidence presented related to Amdura discussed in section IV.b, *supra*, Mr. Pruitt has presented eyewitness testimony about the types of pumps on which he worked.  Mr. Dumas specifically testified about Mr. Pruitt's work on a general fire service pump and a fuel oil transfer pump.  (D.I. 369, Ex. E at 61:2–67:22)  In addition, documents from before and after Mr. Pruitt's service on board the *USS Tolovana* create a genuine issue of material fact about whether the general fire service pump and the fuel oil transfer pumps on board were manufactured by

Warren Pumps and were located in rooms where Mr. Pruitt worked.  (D.I. 369, Ex. F, Ex. G)

Thus, a reasonable jury could find that Mr. Pruitt worked on Warren Pumps without engaging in

impermissible conjecture.

Further, Mr. Pruitt presents adequate evidence of "frequency, regularity, or proximity" of

his work on a Warren Pumps pump to create a genuine issue of material fact regarding

substantial factor causation.  *See Thomasson*, 2015 WL 1639730, at *4.  Mr. Dumas testified that

Mr. Pruitt worked on these pumps every one to two months for two to three hours at a time.

(D.I. 369, Ex. E at 61:2–67:22)  Mr. Dumas further testified that Mr. Pruitt's work created visible

dust, which Mr. Dumas observed Mr. Pruitt breathe.  (*Id.*)  In addition, Mr. Pruitt's industrial

hygienist, in an affidavit, provided evidence about the intensity of exposures resulting from Mr.

Pruitt's work with gaskets and packing material.  (D.I. 369, Ex. Q)  Importantly, "the question of

'substantiality' is one of degree normally best left to the fact-finder."  *Abbay*, 2012 WL 975837,

at *1 n.1 (citing *Redland Soccer Club, Inc.*, 55 F.3d at 851).

Viewing the record in the light most favorable to Mr. Pruitt, there remains a genuine

issue of material fact as to whether Warren Pumps' products were a substantial factor in causing

Mr. Pruitt's injuries.  Thus, the court recommends denying Warren Pumps' motion for summary

judgment.  *See Lindstrom*, 424 F.3d at 492; *Damon v. Aireon Mfg. Corp.*, 2015 WL 9461593, at

*1 n.1 (E.D. Pa. Sept. 1, 2015); *Delatte*, 2011 WL 11439127, at *1 n.1.

## V.   CONCLUSION

For the foregoing reasons, and as addressed in the chart *infra*, the court recommends

GRANTING Amdura and BorgWarner's motions for summary judgment and DENYING

Gardner Denver and Warren Pumps' motions for summary judgment.

| Defendant | Motion for Summary Judgment |
|---|---|
| Amdura LLC | GRANT |
| BorgWarner Morse TEC LLC | GRANT |
| Gardner Denver Inc. | DENY |
| Warren Pumps LLC | DENY |

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: July 30, 2020

Sherry R. Fallon
United States Magistrate Judge