IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: ASBESTOS LITIGATION | ) |
| | ) |
| JOHN W. PRUITT, SR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 18-1101 (MN) (SRF) |
| | ) |
| AIR & LIQUID SYSTEMS | ) |
| CORPORATION, et al. | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**

Ian Connor Bifferato, THE BIFFERATO FIRM, P.A., Wilmington, DE; Brian E. Farnan, Michael J. Farnan, FARNAN LLP, Wilmington, DE; Gibbs C. Henderson, Charles P. Stern, WATERS & KRAUS, LLP, Dallas, TX – Attorneys for Plaintiff.

Matthew P. Donelson, Brian D. Ahern, ECKERT, SEAMANS CHERIN & MELLOTT, LLC, Wilmington, DE – Attorney for Defendant Gardner Denver.

Armand J. Della Porta, Jr., Anna Marina McCann, Jessica L. Tyler, MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, Wilmington, DE – Attorneys for Defendant Warren Pumps, LLC.

September 23, 2020
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE**

Presently before the Court are the objections of Defendant Gardner Denver ("Gardner Denver") (D.I. 402) and the objections of Warren Pumps, LLC ("Warren Pumps") (D.I. 403) to Magistrate Judge Fallon's Report and Recommendation (D.I. 399, "the Report"). The Report recommended denying Gardner Denver's (D.I. 318) and Warren Pumps' motions (D.I. 326) for summary judgment against Plaintiff John W. Pruitt, Sr. ("Plaintiff" or "Mr. Pruitt"). The Court has reviewed the Report (D.I. 399), Gardner Denver's objections (D.I. 402), Warren Pumps' objections (D.I. 403) and Plaintiff's responses thereto (D.I. 411, 412), and the Court has considered *de novo* the objected-to portions of the Report and the relevant portions of Gardner Denver's and Warren Pumps' motions for summary judgment and Plaintiff's responses to those motions (*see* D.I 319, 329, 365, 369, 376, 380). For the reasons set forth below, both Gardner Denver and Warren Pumps' objections are OVERRULED, the Report is ADOPTED, and Defendants' motions for summary judgement are DENIED.

**I.     BACKGROUND**

The Report correctly set out the procedural history of this case. (D.I. 399 at 2). On July 26, 2018, Mr. Pruitt sued multiple defendants, including Gardner Denver and Warren Pumps, asserting claims arising from Mr. Pruitt's alleged harmful exposure to asbestos. (D.I. 1). On August 9, 2018 Mr. Pruitt filed an amended complaint ("the First Amended Complaint") (D.I. 50). On January 31, 2020, Gardner Denver and Warren Pumps each filed a motion for summary judgment. (D.I. 318, 326).

The Report also set forth the facts underlying the motion. There is no dispute as to these facts, and the Court adopts them as follows in their entirety (D.I. 399 at 3-9):

> Mr. Pruitt alleges that he developed mesothelioma as a result of exposure to asbestos-containing materials during his service as a

machinist mate in the United States Navy and as a parts purchaser at Schroer Implement Co. ("Schroer"). (D.I. 50 ¶ 15; Ex. A). Mr. Pruitt contends that he was injured due to exposure to asbestos-containing products that defendants manufactured, sold, distributed, licensed, or installed. (D.I. 50 ¶¶ 5–13, 19–22). Accordingly, Mr. Pruitt asserts claims for strict liability, negligence, false representation, and punitive damages. ( D.I. 50).

Mr. Pruitt was deposed on August 20 and 21, 2018. (D.I. 79, 85). Edmond Dumas ("Mr. Dumas"), a shipfitter who served on the USS Tolovana with Mr. Pruitt from September 1960 to December 1963, was also deposed on February 12, 2019, as a fact and product identification witness. (D.I. 313, Ex. D at 14:4–10, 26:19–24).

### Mr. Pruitt

Mr. Pruitt joined the United States Navy in 1958. (D.I. 329, Ex. B at 12:4–9). He was first stationed on the USS Bayfield, an attack transport. (*Id.* at 12:21–13:1). In 1959, Mr. Pruitt was stationed on the USS Tolovana, an oil tanker. (*Id.* at 13:1–3, 13:15–21, 14:10–15). He served as a machinist mate and worked on auxiliary equipment such as pumps, valves, winches, purifiers, and compressors. (*Id.* at 16:14–17:19).

Mr. Pruitt stated that he used machinery to ensure pumps were pumping to capacity. (D.I. 313, Ex. B at 17:23–25). He testified that he only worked on black oil pumps that pumped fuel oil from the USS Tolovana to other ships and that these pumps were located underneath the engine room. (*Id.* at 18:4–7, 11–14; Ex. C at 27:24–28:5). He estimated that the pumps were twenty-five or thirty years old. (D.I. 313, Ex. C at 21:19–24). In repairing pumps, he worked with packing material and gasket material. (D.I. 313, Ex. B at 20:14–23:13). Mr. Pruitt removed old packing material with a hook, which produced dust. (*Id.* at 20:14–25). He would then measure, cut, and insert new packing material into the packing gland before tightening and sealing the pump. (*Id.* at 19:22–20:2). Mr. Pruitt testified that this process also produced dust. (*Id.* at 21:16–19). He replaced the packing in pumps approximately once per year. (*Id.* at 19:13–16). Mr. Pruitt also removed gasket material with a scraper, which produced dust. (*Id.* at 22:11–18). Mr. Pruitt testified that he worked on the maintenance of pumps a couple times per month. (*Id.* at 24:22–25:8). He recalled Ingersoll Rand as a manufacturer of pumps and, though he knew there were other manufacturers of pumps, he could not recall their names. (*Id.* at 25:9–20, 27:17–21).

Mr. Pruitt replaced brakes and brake lining on winches a couple times per year. (*Id.* at 37:23–38:12, 42:11–16). Winches were

located on deck and came in three sizes: (1) six feet tall and six feet wide, (2) two feet tall and two feet wide, and (3) six feet tall and one inch wide. (D.I. 313, Ex. C at 51:11–52:25). Mr. Pruitt stated that he did not perform any brake work on the largest winches. (*Id.* at 54:13–16). When asked to define a winch, Mr. Pruitt testified that "[a] winch is something that you use to help move everything around." (D.I. 313, Ex. B at 37:2–4). He could not recall the manufacturer or maintenance history of the winches he encountered. (D.I. 313, Ex. C at 53:6–14, 87:1–17). In replacing winch brakes, he would remove portions of the winch to allow access to the brake and then remove the brake. (*Id.* at 59:25–60:20). It would take thirty minutes to remove the brake itself, as he had to loosen levers and take bolts out of the winch. (*Id.* at 60:21–61:4). Mr. Pruitt would cut a new brake pad and then use a brake lining machine to put the lining on the brake shoe and grind the brake. (D.I. 313, Ex. B at 38:13–39:13). It took a few hours to attach the brake pads to the brake lining. (D.I. 313, Ex. C at 26:12–17). He would install the brake lining by hammering the rivets into the brake shoe. (*Id.* at 67:12–20, 68:1-6). He could not recall the manufacturer of the brake lining. (*Id.* at 70:8–17). Mr. Pruitt remembers Bendix as a manufacturer of brake pads and brake shoes. (D.I. 313, Ex. B at 41:14–19; Ex. C at 84:11–15).

Mr. Pruitt was honorably discharged in 1963. (D.I. 313, Ex. B at 42:17–21). He subsequently worked at Schroer, a John Deere farm equipment dealership in Valdosta, Georgia. (*Id.* at 43:1–43:8). He started his career at Schroer as a runner and was later promoted to a parts manager in 1966. (D.I. 313, Ex. B at 43:9–13; Ex. C at 103:8–19). As a runner, he delivered and picked up parts such as brakes, clutches, and paint decals. (D.I. 313, Ex. C at 30:9–16, 103:22–104:2, 104:13–20). After picking up these parts, he would deliver them to Schroer. (*Id.* at 105:3–10). Mr. Pruitt estimated that fifty to sixty percent of his time was spent delivering parts and forty to fifty percent was spent in Schroer's warehouse. (*Id.* at 106:18–107:7). He did not recall the manufacturer of the brakes he delivered as a runner. (*Id.* at 196:13–15). In 1966, he started working as a parts manager and was tasked with finding and ordering parts, such as brakes and clutches, that were installed at Schroer. (D.I. 313, Ex. B at 46:11–14; Ex. C at 30:2–31:2, 102:18–22, 103:14–21). Approximately ten to fifteen percent of the John Deere tractors were under warranty and, for these trucks, the mechanics at Schroer used Bendix brakes and clutches obtained from a John Deere dealer. (D.I. 313, Ex. B at 49:1–19). Each Bendix brake came in a box labeled with a part number but did not contain a warning that it came from a John Deere dealership. (D.I. 313, Ex. C at 123:4–14). Mr. Pruitt did not recall seeing any parts that were labelled "John Deere" and sometimes received brakes without an indication as to

3

their manufacturer. (*Id.* at 144:23–145:15, 135:22–136:6). He stated that he handled bare parts if they were delivered without packaging. (*Id.* at 163:21–164:7). For the eighty-five percent of John Deere tractors that were not under warranty, the mechanics used "[a]ny brand [of brakes they] could get a hold of," typically "the cheapest [they] could find." (*Id.* at 158:1-14, 159:15-23; Ex. B at 49:1-6, 50:6–13). John Deere was the most expensive brand of equipment. (D.I. 313, Ex. C at 157:14–25). He only ordered John Deere supplied clutches for the John Deere brakes but could not recall who manufactured these clutches. (D.I. 313, Ex. B at 50:21–51:2, 53:2–5).

Mr. Pruitt testified that, during his career at Schroer, he did not perform any work on farm equipment. (D.I. 313, Ex. C at 32:10–14). As the parts manager, he spent approximately eighty percent of his time waiting on customers and mechanics at the parts counter, which was twenty to thirty feet away from the mechanics performing work on the tractors. (D.I. 313, Ex. B at 48:15–17; Ex. C at 32:22–33:1). He would only see mechanics perform work if he took a part into the mechanic area or if he walked through the shop. (D.I. 313, Ex. C at 131:22–132:3; 133:5–21). Mr. Pruitt could not estimate how often he took parts into the mechanic area, but noted that he did not normally do so, as mechanics ordinarily came to the parts counter to retrieve parts. (*Id.* at 132:4–133:4).

Mr. Pruitt testified that he observed others perform brake work two or three times per week on both diesel and gas John Deere tractors. (D.I. 313, Ex. B at 45:14–16; Ex. C at 107:12–108:1). Mr. Pruitt testified that he also observed others perform approximately two or three clutch jobs per week and suggested that the frequency of these clutch jobs increased in the springtime. (D.I. 313, Ex. B at 45:14–22). He testified that when mechanics performed brake jobs or clutch jobs, dust was produced. (*Id.* at 47:16–48:14).

He left Schroer in 1977. (*Id.* at 53:15–17). He worked as a paramedic until March of 2017. (*Id.* at 53:18–25). Mr. Pruitt was diagnosed with mesothelioma in May of 2018. (*Id.* at 54:20–22, 55:14–16).

### **Mr. Dumas**

Mr. Dumas served as a shipfitter third class on the USS Tolovana from September 1960 through December 1963. (D.I. 313, Ex. D at 13:12–16, 13:24–14:10). As a shipfitter, Mr. Dumas performed valve repairs by replacing gaskets and packing. (*Id.* at 15:4–9, 21:16–18). He and Mr. Pruitt were assigned to work together, which they did approximately thirty percent of the time. (D.I. 313, Ex. D

at 30:8–19, 31:20–23, 100:20–25; Ex. E at 18:23–19:7). Mr. Dumas testified that there were three different types of fuel on the USS Tolovana: crude oil, JP-5,6 and avgas. (*Id.* at 19:16–21). Crude oil was used for the majority of ships, JP-5 was used for fighter jets, and avgas was used for aircraft carriers. (D.I. 313, Ex. D at 19:22–20:3; Ex. E at 39:11–14). There were different types of pumps for each of these fuel types. (D.I. 313, Ex. D at 20:9–16). Mr. Dumas observed Mr. Pruitt performing work and maintenance on cargo pumps, JP-5 pumps, and avgas pumps. (D.I. 313, Ex. E at 67:17–23). Cargo pumps pumped crude oil and were found in the aft pump room. (D.I. 313, Ex. D at 42:2–42:14, 43:24–44:1). Mr. Dumas could not recall the pressure, serial number, or maintenance history of any particular pump. (*Id.* at 111:13–20, 112:5–16). Mr. Dumas testified that most of the pumps were mounted vertically but could not recall how all of the pumps were mounted. (*Id.* at 111:21–112:4).

Mr. Dumas testified that JP-5 was similar to kerosene. (D.I. 313, Ex. E at 39:7–10). Mr. Dumas recalled that, before Mr. Pruitt performed maintenance on a pump, Mr. Pruitt would tag a pump to inform others on the ship that the pump was offline and that he was performing maintenance. (D.I. 313, Ex. D at 32:4–15, 40:6–20). Mr. Dumas testified that Mr. Pruitt inspected pumps, replaced valves, and replaced gaskets. (*Id.* at 33:8–13). He observed Mr. Pruitt working in the mid ship pump room, which housed the JP-5 pumps, and the aft pump room, which housed the four major cargo pumps. (*Id.* at 36:9–37:16). Mr. Dumas stated that he was unsure what specific maintenance work Mr. Pruitt performed on pumps. (D.I. 313, Ex. E at 68:20–69:18).

Mr. Dumas observed Mr. Pruitt replace gaskets and packing on cargo pumps and testified that this maintenance produced dust. (D.I. 313, Ex. D at 43:5–19, 44:2–8, 46:3–15, 47:24–48:11). Mr. Dumas estimated that Mr. Pruitt had to perform maintenance on cargo pumps once every one or two months, and may have had to maintain cargo pumps with greater frequency when the USS Tolovana was refueling many other ships. (*Id.* at 49:10–50:13). Mr. Dumas testified that Mr. Pruitt also worked on fire bilge, ballast, fire general service, fuel transfer, diesel emergency fire, and auxiliary pumps. (*Id.* at 58:18–24, 60:2–11, 64:12–25, 67:24–68:12, 70:20–71:15).

Mr. Dumas observed Mr. Pruitt perform general maintenance on a fire general service pump and a fuel transfer pump every one to two months, which required removing and replacing gasket and packing material. (*Id.* at 61:4–67:23). Mr. Dumas further testified that Mr. Pruitt's maintenance work took two to three hours and created

5

>visible dust, which Mr. Dumas observed Mr. Pruitt breathe. (*Id.*). Mr. Dumas also stated that he saw Mr. Pruitt replacing gaskets and packing material for a diesel emergency fire pump in the aft section of the ship, which caused Mr. Pruitt to breathe in "dust and particles" in a process that took one to two hours. (*Id.* at 67:24–70:19). He observed Mr. Pruitt inspecting the diesel emergency fire pump every one to two months in a process that involved gaskets and packing material. (*Id.*).

## II. **LEGAL STANDARD**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). If the moving party has carried its burden, the nonmovant must then "come forward with 'specific facts showing that there is a *genuine issue* for trial.'" *Id.* at 587 (quoting FED. R. CIV. P. 56(e)) (emphasis in original). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000). The Court may not grant summary judgment if a "reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 459 (3d Cir. 1989).

To defeat a motion for summary judgment, however, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. United States Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). "[The] mere existence of some alleged factual dispute between the parties will not defeat

6

an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 (3d Cir. 1995). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## III. <u>DISCUSSION</u>

### A. **Gardner Denver's Objections**

Gardner Denver objects to the Report on two bases: 1) that it incorrectly recommended denial of summary judgment based on an inaccurate reading of the record for alleged exposure to original gaskets and 2) that it incorrectly relied on the affidavit of Captain William Lowell. (*See* D.I. 402). The Court addresses each of these objections in turn.

#### 1. **Record for Exposure to Original Gaskets**

Gardner Denver objects that the Report focused on the testimony of product identification witness, Edmond Dumas, to determine that genuine issues of material fact precluded grant of summary judgment. Gardner Denver notes that "[d]uring the discovery portion of his deposition, Mr. Dumas did not identify any products manufactured by Gardner Denver." (D.I. 402 at 2). As noted below, however, Plaintiff's expert Captain Arnold Moore opined that a "Gardner Denver fire pump was installed on TOLOVANA during construction and remained aboard throughout Mr. Pruitt's service." (D.I. 365, Ex. H at 9). In addition, evidence was offered regarding

7

Mr. Pruitt's work on the fire pump and the extent of his exposure to it. For example, Mr. Pruitt described performing maintenance on pumps "about once a year" unless repairs were needed. (D.I. 376, Ex. A at 22:15–23:1). Mr. Dumas testified that Mr. Pruitt inspected pumps, specifically mentioning the diesel emergency fire pump, every one to two months in a process that involved working on packing material and gaskets. (D.I. 313, Ex. D at 67:24–70:19; D.I. 365 at 5-6). Mr. Dumas also testified that he observed Mr. Pruitt replacing gaskets and packing material, which caused Mr. Pruitt to breathe in "dust and particles" in a process that took one to two hours. (*Id.*). Based on the presence of the Gardner Denver diesel emergency fire pump and testimony regarding Mr. Pruitt's work on the pump, genuine issues of material fact remain as to whether Mr. Pruitt worked on the Gardner Denver emergency diesel fire pump to such an extent that it was a substantial factor in causing his subsequent injuries.

### 2. Reference to the Affidavit of Captain Lowell

Gardner Denver is correct that the Report errantly cited to the withdrawn affidavit of Captain Lowell and referred to him as an expert in naval equipment who "stated that the diesel emergency fire pump on board the USS Tolovana required the use of asbestos-containing packing and gaskets." (D.I. 399 at 19). Although Plaintiff had withdrawn Captain Lowell's affidavit, however, Plaintiff had substituted it with an affidavit of Captain Moore, who is also a naval expert. (D.I. 365, Ex. H). The Court has reviewed the affidavit of Captain Moore and his opinion that:

> The 1972 general information book records one Gardner Denver horizontal centrifugal emergency fire pump driven by a diesel engine was installed in the forward pump room on TOLOVANA. The Sparrows Point Shipyard list of machinery also records one Gardner Denver centrifugal fire and bilge pump was installed in the forward pump room on TOLOVANA. The exact terminology for this pump varied but ***it is clear that one Gardner Denver fire pump was installed on TOLOVANA during construction and remained aboard throughout Mr. Pruitt's service.***

8

> Gardner Denver drawings AIA-158A110 and AIA-158A-111 record Gardner Denver fire pumps utilized braided asbestos packing. Navy specifications for water pumps, including fire pumps, required that the casings for these pumps be sealed with compressed asbestos sheet gaskets.

(D.I. 365, Ex. H at 9) (emphasis added).

Based on Captain Moore's opinions (and other evidence offered by Plaintiff), there remains a genuine issue of material fact as to whether Mr. Pruitt worked on the Gardner Denver emergency diesel fire pump to such an extent that it was a substantial factor in causing his subsequent injuries. The reference in the Report to Captain Lowell is thus harmless, and Gardner Denver's objection based on that reference is overruled.

### B. Warren Pump's objections

Warren Pump objects to the Report's conclusion that the evidence cited raises "a genuine dispute as to whether Plaintiff's alleged injuries were substantially caused by asbestos-containing products manufactured or supplied by Warren" Pumps. (D.I. 403 at 2). The Court disagrees. Viewing the evidence in the light most favorable to Mr. Pruitt, as the Court is required to do, there are genuine issues of material fact as to whether Warren Pumps' products were a substantial factor in causing Mr. Pruitt's injuries.

Although it is true that neither Mr. Pruitt nor Mr. Dumas identified a Warren Pumps' product, both testified as to Mr. Pruitt's work on a fire general service pump and a fuel transfer pump and the extent of that work. (*See, supra.*, at 3-4; 5-7). To identify the pumps, Plaintiff relies on ship records from 1952 and 1972 – pre- and post- dating Mr. Pruitt's service – to offer circumstantial evidence that the fire general service pump and the fuel transfer pump that Mr. Dumas testified to having seen Mr. Pruitt work on were manufactured by Warren Pumps. (D.I. 369 at 4–5). Plaintiff also relies on discovery (both written and deposition testimony) provided by Warren Pumps in other cases along with an instruction manual for a Warren Pumps' fire pump

9

from 1961 to create a factual issue about whether Warren Pumps products on board the USS Tolovana were provided to the United States Navy with asbestos-containing gaskets and packing material. (*Id.*, Exs. H, I, J, K, O, S). The Court agrees with the Report that a reasonable jury could find that those records establish that replacement parts for the relevant pumps that Warren Pumps provided to the Navy during the relevant time contained asbestos. (*Id.*). Additionally, Plaintiff offers the affidavit of Captain Moore, who opined that the fuel oil transfer pump and the fire pump mentioned were manufactured by Warren Pumps and remained on board the USS Tolovana throughout Mr. Pruitt's service. (*Id.*, Ex. T at 7–9). Captain Moore opined that the relevant pumps would have been insulated with "85% magnesia," an insulating material containing 15% asbestos fiber. (*Id.* at 7).

Mr. Pruitt's testimony, Mr. Dumas' testimony, and Captain Moore's affidavit viewed in the light most favorable to Mr. Pruitt, provide circumstantial evidence upon which a reasonable jury could conclude that Mr. Pruitt was exposed to an asbestos-containing Warren Pumps products. In addition, documents from before and after Mr. Pruitt's service on board the USS Tolovana create a genuine issue of material fact about whether the general fire service pump and the fuel oil transfer pumps on board were manufactured by Warren Pumps and were located in rooms where Mr. Pruitt worked. (*Id.*, Exs. F, G). Thus, a reasonable jury could find that Mr. Pruitt worked on Warren Pumps without engaging in impermissible conjecture.

Further, Mr. Pruitt presents adequate evidence of "frequency, regularity, or proximity" of his work on a Warren Pumps pump to create a genuine issue of material fact regarding substantial factor causation. Mr. Dumas testified that Mr. Pruitt worked on these pumps every one to two months for two to three hours at a time. (*Id.*, Ex. E at 61:2–67:22). He also testified that Mr. Pruitt's work created visible dust, which Mr. Dumas observed Mr. Pruitt breathe. (*Id.*). In

10

addition, Mr. Pruitt's industrial hygienist, in an affidavit, provided evidence about the intensity of exposures resulting from Mr. Pruitt's work with gaskets and packing material. (*Id.*, Ex. Q). As stated above, "the question of 'substantiality' is one of degree normally best left to the fact-finder." *Redland Soccer Club, Inc. v. Dep't of Army of U.S.*, 55 F.3d 827, 851 (3d Cir. 1995). Thus, the Court will deny Warren Pumps' motion for summary judgment.

## IV    CONCLUSION

For the foregoing reasons, the Court OVERRULES both Gardner Denver's objections (D.I 402) and Warren Pumps' objections (D.I. 403) and ADOPTS the Report (D.I. 399). Gardner Denver's motion for summary judgment (D.I. 318) is DENIED. Warren Pumps' motion for summary judgment (D.I. 326) is DENIED. An appropriate order will follow.